```
Approved:  _____
           STEPHEN J. RITCHIN/ANDREW D. BEATY
           Assistant United States Attorneys

Before:    THE HONORABLE KATHARINE H. PARKER
           United States Magistrate Judge
           Southern District of New York
```

**17 MAG 4154**

```
------------------------------------ X
                                     :   SEALED
                                     :   COMPLAINT
UNITED STATES OF AMERICA             :
                                     :   Violations of
             - v. -                  :   18 U.S.C. §§ 2339B,
                                     :   2339D, 371, 924(c),
SAMER EL DEBEK,                      :   and 2, and 50 U.S.C.
     a/k/a "Samer Eldebek,"          :   § 1705(a)
                                     :
             Defendant.              :   COUNTY OF OFFENSE:
                                     :   NEW YORK
                                     :
------------------------------------ X

STATE OF NEW YORK         )
                          )   ss.:
COUNTY OF NEW YORK        )
```

DANIEL M. GANCI, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI"), and charges as follows:

## COUNT ONE

(Provision of Material Support to a
Designated Foreign Terrorist Organization)

1. From at least in or about 2007, up to and including in or about September 2016, in the Southern District of New York, Lebanon, and elsewhere, SAMER EL DEBEK, a/k/a "Samer Eldebek," the defendant, knowingly did provide, and attempt to provide, and aided and abetted the provision of, "material support or resources," as that term is defined in Title 18, United States Code, Section 2339A(b), to a foreign terrorist organization, to wit, Hizballah, which has been designated by the Secretary of State as a foreign terrorist organization since 1997, pursuant to Section 219 of the Immigration and Nationality Act ("INA"), and is currently designated as such as of the date of the filing of this Complaint, including, among other things, personnel,

knowing that Hizballah was a designated foreign terrorist organization (as defined in Title 18, United States Code, Section 2339B(g)(6)), that Hizballah engages and has engaged in terrorist activity (as defined in section 212(a)(3)(B) of the INA), and that Hizballah engages and has engaged in terrorism (as defined in section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989).

(Title 18, United States Code, Sections 2339B(a)(1), (d)(1)(A), (d)(1)(C), (d)(1)(D), (d)(1)(E), (d)(1)(F), and (d)(2), and 2.)

## COUNT TWO

(Conspiracy to Provide Material Support to a
Designated Foreign Terrorist Organization)

2.      From at least in or about 2007, up to and including in or about September 2016, in the Southern District of New York, Lebanon, and elsewhere, SAMER EL DEBEK, a/k/a "Samer Eldebek," the defendant, and others known and unknown, knowingly and willfully did combine, conspire, confederate and agree together and with each other to provide "material support or resources," as that term is defined in Title 18, United States Code, Section 2339A(b), to a foreign terrorist organization, to wit, Hizballah, which was has been designated by the Secretary of State as a foreign terrorist organization since 1997, pursuant to Section 219 of the Immigration and Nationality Act ("INA"), and is currently designated as such as of the date of the filing of this Complaint.

3.      It was a part and an object of the conspiracy that SAMER EL DEBEK, a/k/a "Samer Eldebek," the defendant, and others known and unknown, would and did agree to provide Hizballah with material support and resources, including personnel, knowing that Hizballah was a designated foreign terrorist organization (as defined in Title 18, United States Code, Section 2339B(g)(6)), that Hizballah engages and has engaged in terrorist activity (as defined in section 212(a)(3)(B) of the INA), and that Hizballah engages and has engaged in terrorism (as defined in section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989), in violation of Title 18, United States Code, Section 2339B.

4.      In furtherance of the conspiracy and to effect the illegal object thereof, SAMER EL DEBEK, a/k/a "Samer Eldebek," the defendant, and others known and unknown, committed the overt acts set forth below, among others:

2

a. Between in or about 2008 and in or about 2014, EL DEBEK received training from Hizballah in surveillance, the production and use of explosives, and the use of firearms.

b. In or about 2009, EL DEBEK traveled to Thailand on behalf of Hizballah.

c. In or about 2011, EL DEBEK traveled to Panama on behalf of Hizballah.

d. In or about 2012, EL DEBEK traveled to Panama on behalf of Hizballah.

(Title 18, United States Code, Sections 2339B(a)(1), (d)(1)(A), (d)(1)(C), (d)(1)(D), (d)(1)(E), (d)(1)(F), and (d)(2).)

## COUNT THREE

(Receipt of Military-type Training From a
Designated Foreign Terrorist Organization)

5. From at least in or about 2008, up to and including in or about 2014, in Lebanon and elsewhere, SAMER EL DEBEK, a/k/a "Samer Eldebek," the defendant, knowingly received military-type training from and on behalf of Hizballah, which has been designated by the Secretary of State as a foreign terrorist organization since 1997, pursuant to Section 219 of the Immigration and Nationality Act ("INA"), and is currently designated as such as of the date of the filing of this Complaint, knowing that Hizballah was a designated foreign terrorist organization (as defined in Title 18, United States Code, Section 2339D(c)(4)), that Hizballah engages and has engaged in terrorist activity (as defined in section 212(a)(3)(B) of the INA), and that Hizballah engages and has engaged in terrorism (as defined in section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989), to wit, EL DEBEK received training in the use of weapons, in combat, and in the construction and use of explosives, from other members of Hizballah,.

(Title 18, United States Code, Sections 2339D(a), (b)(1), (b)(3), (b)(5), and (b)(6).)

## COUNT FOUR

(Conspiracy to Receive Military-type Training From a
Designated Foreign Terrorist Organization)

6.     From at least in or about 2008, up to and including in or about 2014, in Lebanon and elsewhere, SAMER EL DEBEK, a/k/a "Samer Eldebek," the defendant, and others known and unknown, knowingly and willfully did combine, conspire, confederate and agree together and with each other to receive military-type training from and on behalf of Hizballah, which has been designated by the Secretary of State as a foreign terrorist organization since 1997, pursuant to Section 219 of the Immigration and Nationality Act ("INA"), and is currently designated as such as of the date of the filing of this Complaint.

7.     It was a part and an object of the conspiracy that SAMER EL DEBEK, a/k/a "Samer Eldebek," the defendant, and others known and unknown, would and did receive military-type training from and on behalf of Hizballah, knowing that Hizballah was a designated foreign terrorist organization (as defined in Title 18, United States Code, Section 2339D(c)(4)), that Hizballah engages and has engaged in terrorist activity (as defined in section 212(a)(3)(B) of the INA), and that Hizballah engages and has engaged in terrorism (as defined in section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989), in violation of Title 18, United States Code, Section 2339D.

8.     In furtherance of the conspiracy, SAMER EL DEBEK, a/k/a "Samer Eldebek," the defendant, and others known and unknown, committed the overt acts set forth in paragraph 4 above, which are fully incorporated by reference herein, among others.

(Title 18, United States Code, Sections 371, 2339D(a), (b)(1),
(b)(3), (b)(5), and (b)(6).)

## COUNT FIVE

(Possessing, Carrying, and Using Firearms During and in Relation
to a Crime of Violence)

9.     From at least in or about 2008, up to and including in or about 2014, in the Southern District of New York, Lebanon, and elsewhere, SAMER EL DEBEK, a/k/a "Samer Eldebek," the defendant, knowingly, and during and in relation to a crime of

4

violence for which he may be prosecuted in a court of the United States, namely, the offenses charges in Counts One through Four of this Complaint, did use and carry a firearm, and, in furtherance of such crimes, did possess, carry, and use a firearm, and did aid and abet the use, carrying, and possession of a firearm, to wit, firearms that were capable of automatically firing more than one shot without manual reloading, including the AK-47, the M-16, and the MP-5 assault rifles; a machinegun, including the Russian PKS automatic rifle; and rocket-propelled grenades ("RPG") and other destructive devices in the form of improvised explosive devices.

(Title 18, United States Code, Sections 924(c)(1)(A)(i), (A)(ii), (A)(iii), (B)(i), (B)(ii), and 2.)

## COUNT SIX

(Conspiracy to Make or Receive a Contribution of Funds, Goods, or Services to, and for the Benefit of, Hizballah)

10. From at least in or about 2008, up to and including in or about September 2016, in the Southern District of New York, Lebanon, and elsewhere, SAMER EL DEBEK, a/k/a "Samer Eldebek," the defendant, a United States person, knowingly and willfully, along with others known and unknown, did combine, conspire, confederate, and agree together and with each other to make and receive a contribution of funds, goods, and services to and for the benefit of, as well as from, Hizballah, a specially designated terrorist, by agreeing with others to provide to Hizballah personnel and services, and receiving funds from Hizballah.

(Title 50, United States Code, Section 1705(a); Title 31, Code of Federal Regulations, Sections 595.204, 595.205, 595.311.)

## COUNT SEVEN

(Making or Receiving a Contribution of Funds, Goods, or Services to, and for the Benefit of, Hizballah)

11. From at least in or about 2008, up to and including in or about September 2016, in the Southern District of New York, Lebanon, and elsewhere, SAMER EL DEBEK, a/k/a "Samer Eldebek," the defendant, a United States person, willfully attempted to and did make and receive a contribution of funds, goods, and services to and for the benefit of, as well as from, Hizballah, a specially designated terrorist, in that EL DEBEK attempted to

5

and did provide to Hizballah personnel and services, and attempted to and did receive funds from Hizballah.

(Title 50, United States Code, Section 1705(a); Title 31, Code of Federal Regulations, Sections 595.204, 595.205, 595.311.)

The bases for my knowledge and the foregoing charges are, in part, as follows:

12.  I am a Special Agent with the FBI, currently assigned to the New York Joint Terrorism Task Force (the "JTTF"). The focus of my counterterrorism and counterintelligence efforts has been investigating and disrupting terrorist activities by Hizballah and, in particular, the Islamic Jihad Organization ("IJO"). I have been personally involved in the investigation of this matter, and I base this affidavit on that personal experience, as well as on my conversations with other law enforcement agents, and my examination of various reports and records. Because this affidavit is being submitted for the limited purpose of demonstrating probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

### Overview

13.  Based on my involvement in this investigation and my review of reports prepared in the course of this investigation, and as set forth in greater detail below, I understand the following in substance and in part:

   a.  SAMER EL DEBEK, a/k/a "Samer Eldebek," the defendant, is a 37-year old naturalized United States citizen.

   b.  From at least in or about 2007 up to and including at least in or about 2016, EL DEBEK was a member of the Islamic Jihad Organization ("IJO"), which is a highly compartmentalized component of Hizballah responsible for the planning, preparation, and execution of intelligence, counterintelligence, and terrorist activities outside of Lebanon. Beginning in or about 2008, EL DEBEK received extensive training from Hizballah and the IJO, including in bomb-making, weapons, tradecraft, and military tactics.

   c.  EL DEBEK's responsibilities as a member of Hizballah's IJO included traveling operationally on behalf of

6

Hizballah, including to Panama, where his tasks included gathering information for Hizballah about potential American, Israeli, and Panamanian targets, and to Thailand, where his tasks included the removal of explosive precursor materials from a Hizballah safe house that was believed to have been compromised.

### Hizballah and the Islamic Jihad Organization

14. Based on my training and experience, my participation in this and related investigations, and my review of publicly available documents, reports, and other materials, I understand the following, in substance and in part:

   a. Hizballah is a Lebanon-based Shia Islamic organization with political, social, and terrorist components. Hizballah was founded in the early 1980s with support from Iran after the 1982 Israeli invasion of Lebanon, and its mission includes establishing a fundamentalist Islamic state in Lebanon. In 1997, the U.S. Department of State designated Hizballah a Foreign Terrorist Organization, pursuant to Section 219 of the INA, and it remains so designated today. In 2001, pursuant to Executive Order 13,224, the U.S. Department of the Treasury designated Hizballah a Specially Designated Global Terrorist entity. In 2010, State Department officials described Hizballah as the most technically capable terrorist group in the world and a continued security threat to the United States.

   b. The IJO, which is also known as the External Security Organization and "910," is a component of Hizballah responsible for the planning and coordination of intelligence, counterintelligence, and terrorist activities on behalf of Hizballah outside of Lebanon. IJO operatives are typically assigned a Lebanon-based "handler," sometimes referred to as a mentor, responsible for providing taskings, debriefing operatives, and arranging training. IJO often conducts targeted operations in stages, sending waves of one or more operatives with separate taskings such as surveillance, obtaining and storing necessary components and equipment, and attack execution.

   c. Since Hizballah's formation, the organization has been responsible for numerous terrorist attacks that have killed hundreds, including the 1983 bombing of the United States Marine barracks in Lebanon, which killed 241 Marines; the 1983 bombing of the United States Embassy in Beirut, which killed 24 people; the 1985 hijacking of TWA Flight 847, which killed one U.S. citizen; the 1992 bombing of the Israeli Embassy in Argentina, which killed

29 people; and the 1994 bombing of a Jewish cultural center in Buenos Aires, which killed 95 people.

        d.   In July and August 2006, Hizballah and Israel engaged in armed conflict (the "2006 Lebanon War"), resulting in numerous casualties, after an incident on or about July 12, 2006 when Hizballah attacked Israeli Defense Force ("IDF") personnel. A ceasefire brokered by the United Nations went into effect on August 14, 2006.

        e.   In January 2012, Hussein Atris, an IJO operative with dual Lebanese-Swedish citizenship, was detained in Thailand as he tried to board a flight at a Bangkok airport. Atris subsequently led law enforcement personnel to a commercial building near Bangkok that housed a cache of nearly 10,000 pounds of urea-based fertilizer and 10 gallons of ammonium nitrate, which are chemicals that I know, based on my training and experience, can be used to construct explosives. The ammonium nitrate was stored in First Aid ice packs.

        f.   In July 2012, Mouhamad Hassan Mouhamad El Husseini, an IJO operative with dual Lebanese-French citizenship, detonated explosives on a bus transporting Israeli tourists in the vicinity of an airport in Burgas, Bulgaria. Six people were killed and 32 others were injured. Law enforcement authorities recovered three fraudulent, purportedly U.S.-based, driver's licenses during the investigation, subsequently linked the attack to the IJO, and determined that ammonium nitrate was an active ingredient in the explosives.

        g.   Also in July 2012, Hossam Taleb Yaacoub, an IJO operative with dual Lebanese-Swedish citizenship, was arrested after conducting surveillance of Israeli tourists in the vicinity of an airport in Larnaca, Cyprus. Law enforcement authorities seized from Yaacoub a notebook containing coded entries relating to, among other things, Israeli tour busses. In March 2013, Yaacoub was convicted of crimes in Cyprus relating to these activities on behalf of the IJO.

        h.   In May 2015, Hussein Bassam Abdallah, an IJO operative with dual Lebanese-Canadian citizenship, was arrested in Cyprus after Cypriot authorities seized from an apartment rented by Abdallah approximately 8.2 tons of ammonium nitrate, at least some of which was stored in First Aid ice packs. Abdallah possessed a copy of a fraudulent passport at the time of his arrest, and he was subsequently convicted of crimes in Cyprus relating to these activities on behalf of the IJO.

**EL DEBEK's Recruitment and Training**

15.  Agents of the FBI have interviewed SAMER EL DEBEK, a/k/a "Samer Eldebek," the defendant, in person a total of five times between September 8, 2016, and May 23, 2017, and interviewed him by phone on a number of occasions. Based on my review of reports of those interviews, I have learned the following, in substance and in part:

a.  EL DEBEK said he was first recruited by Hizballah in late 2007 or early 2008 and began to receive a salary from Hizballah shortly thereafter. Although EL DEBEK said he did not know why he was recruited, he said he believed he was recruited because he held a U.S. passport.

b.  EL DEBEK reported that he received military training from Hizballah in Lebanon on several occasions, the first of which was likely sometime in 2008 and which continued through approximately 2014. He learned basic military tactics, including how to conduct an ambush and how to maneuver. He was trained on various weapons: the AK-47, M-16, and MP-5 assault rifles,[1] the Russian PKS automatic rifle,[2] a 9 mm pistol, and the RPG 7.[3] As part of Hizballah's security arrangements, EL DEBEK wore a mask during training and was transported to the training facility in a van with windows that were blocked with curtains.

c.  EL DEBEK also reported that he was trained on at least four occasions between 2009 and 2013 in surveillance and counter-surveillance techniques and was taught, among other

---

[1] Based on my conversations with another agent who has expertise in firearms, as well as my own training and experience, I understand that each of the AK-47, M-16, and MP-5 assault rifles are firearms that are capable of automatically firing more than one shot without manual reloading

[2] Based on my conversations with another agent who has expertise in firearms, as well as my own training and experience, I understand that the PKS is a fully-automatic machinegun.

[3] Based on my conversations with another agent who has expertise in firearms, as well as my own training and experience, I understand that the RPG 7 is a rocket-propelled grenade launcher.

9

things, how to look for people following him and how to use disguises.

        d. EL DEBEK stated that he attended Hizballah religious training on one occasion for six days in either 2013 or 2014. The religious training occurred at the same camp at which EL DEBEK attended military training. During the training, a sheikh taught religious rules and topics including martyrdom ideology.

        e. EL DEBEK reported that he was also trained, on several occasions between approximately early 2009 and 2014, in the handling of explosives and the creation of explosive devices. He described in detail how he made explosive devices, including the mixing, drying, and refrigeration of the relevant materials. He also explained how bombs could be remotely detonated and described, among other things, the preferred method of remote detonation for Hizballah.

        f. EL DEBEK was taught how specifically to target people and buildings. EL DEBEK also described how he made landmines, including how he determined the blast radius of the mine. EL DEBEK described being trained to gather many of the chemicals necessary to create an explosive device, some of which could readily be obtained from hardware stores. But EL DEBEK said he was told not to try to gather what he called "samad," an Arabic term which, he later explained, meant ammonium nitrate. EL DEBEK said he was told that during a mission, someone else would provide the ammonium nitrate. He also said he detonated five or six bombs on his last day of training.

    16. An FBI Special Agent Bomb Technician ("SABT-1") participated in one of the interviews of SAMER EL DEBEK, a/k/a "Samer Eldebek," the defendant, and spoke with him at length about bomb-making techniques. Based on reports of conversations with SABT-1, I have learned the following, in substance and in part:

        a. Ammonium nitrate is a chemical precursor used in explosive devices.

        b. SABT-1 assessed that EL DEBEK had received extensive training as a bomb-maker and had a high degree of technical sophistication in this area.

        c. Among other things, SABT-1 confirmed that the detailed descriptions EL DEBEK provided of the construction and

10

use of explosive devices were accurate and reflected information one would obtain from training in explosives.

17. Based on reports of conversations with another FBI Special Agent Bomb Technician ("SABT-2"), and my review of FBI and other law enforcement reports, I have learned that the techniques and methods in which Hizballah trained SAMER EL DEBEK, a/k/a "Samer Eldebek," the defendant, to construct improvised explosive devices ("IEDs") are substantially similar to those used to construct the IED used in the Hizballah bombing of an Israeli tour bus in Burgas, Bulgaria, in 2012.

18. Based on my review of reports of the interviews with SAMER EL DEBEK, a/k/a "Samer Eldebek," the defendant, I have learned the following in substance and in part:

    a. EL DEBEK told FBI agents that he was familiar with the 2012 Hizballah attack on the Israeli tour bus in Burgas, Bulgaria, and that the bomber, Mohamad Husseini, who died in the Bulgaria attack, was connected to his family (specifically, was his aunt's nephew). EL DEBEK identified a photograph of Husseini, and stated that he knew of Husseini's membership in Hizballah's "External Security" unit -- the same unit of which EL DEBEK said he was a member (i.e., the IJO).

    b. EL DEBEK also distinguished Hizballah's tactics from those of Islamic State of Iraq and ash-Sham ("ISIS") and al Qaeda by saying that, unlike those groups, Hizballah does not kill just to kill, and that Hizballah's actions sometimes are intended to send a political message. EL DEBEK, however, distinguished violence against Israelis, saying that Israeli targets were different and that Israel was always a target of Hizballah.

19. Based on my review of emails[4] received pursuant to a lawfully-obtained warrant, I have learned the following, in substance and in part:

    a. On or about July 18, 2006, shortly before SAMER EL DEBEK, a/k/a "Samer Eldebek," the defendant, was recruited into the IJO, see paragraph 15(a), supra, EL DEBEK sent an email from his work account to his personal email account in Arabic,

---

[4] All email and social media accounts referred to herein are accounts that EL DEBEK has identified in interviews as his own.

which expressed support for Hassan Nasrallah, the leader of Hizballah.

       b.    After EL DEBEK had begun receiving the explosives training described above, he received an email that corroborates his statements about his familiarity with explosives and chemical precursors. Specifically, on or about May 30, 2010, a relative abroad ("Individual-1") forwarded an email (the "Email") to EL DEBEK from an individual whose email listed a physical address of a business in Iran. Based on my review of the Email, I understand the following, in substance and in part:

          i. The email described a raw materials business, and expressed hope that Individual-1 and another individual would take part.

          ii. The Email included an attachment, which contained a list of raw materials and chemicals that could be sent from Syria or Dubai.

    20.    Based on my review of FBI laboratory analysis of the items listed in the attachment to the Email described in subparagraph 19(b) above, I have learned that they are often used in explosives, including in improvised explosive devices.

### EL DEBEK's Missions on Behalf of Hizballah

    21.    Based on my review of reports of the interviews with SAMER EL DEBEK, a/k/a "Samer Eldebek," the defendant, I have learned the following, in substance and in part:

       a.    EL DEBEK's first mission abroad for Hizballah was to Thailand and occurred in 2009, shortly after his first explosives training.

       b.    EL DEBEK said he was told that Hizballah was storing explosive precursors in a house in Bangkok, Thailand, and the people who were there had to leave because they were under surveillance. His mission was to clean up the explosive precursors. He was instructed to travel from Lebanon to Malaysia on his Lebanese passport and from Malaysia to Thailand on his U.S. passport, because he would not need a visa to enter Thailand from Malaysia when using his U.S. passport.

       c.    In Malaysia, EL DEBEK said he met his IJO handler, who provided him with a cover story: The handler told EL DEBEK to say he was looking for sex in Thailand. EL DEBEK

12

also reported that he was told to find a female to draw out any surveillance on the house in Bangkok.

        d.    According to EL DEBEK, after he arrived in Thailand, he hired a female escort, to whom he gave a key to the house he was to clean up. EL DEBEK reported that he watched her enter the house and saw nothing suspicious. He said that he later went to the house himself and found approximately 50 boxes containing materials sealed in plastic. EL DEBEK said he did not inspect every box, but he believes the majority, if not all, of the boxes contained "samad," or ammonium nitrate. EL DEBEK described removing the explosive precursors from the house by putting in his rented vehicle as many boxes as he could fit and dumping the remainder of the explosive precursors down the drain. EL DEBEK said that, a day or two later, he received instructions to return the explosive precursors to the house and pay rent to the landlord of the house, which he did. EL DEBEK said he then returned to Malaysia, and then to Lebanon.

    22.    I have reviewed copies of the United States and Lebanese passports of SAMER EL DEBEK, a/k/a "Samer Eldebek," the defendant, made as he left the United States on or about September 20, 2014. Based on that review, I have learned the following, in substance and in part:

        a.    Those passports confirm that EL DEBEK traveled from Lebanon to Thailand in 2009 through Malaysia, as he described, using his U.S. passport to get in and out of Thailand, but using his Lebanese passport for the others legs of the trip.

        b.    Specifically, the passports show stamps indicating that EL DEBEK, using his Lebanese passport, left Lebanon on May 6, 2009, and entered Malaysia the following day. They also show that he left Malaysia on May 9, 2009, using his Lebanese passport, but when he arrived in Thailand the same day he used his U.S. passport.

        c.    When EL DEBEK left Thailand on May 16, 2009, he again used his U.S. passport, but switched to his Lebanese passport when he entered Malaysia that same day. The passports also show that EL DEBEK left Malaysia the following day, May 17, 2009, for Lebanon, and used his Lebanese passport for that trip.

    23.    Based on my review of records received from Facebook pursuant to a lawfully-obtained warrant, I have learned the following, in substance and in part:

a. Using Facebook, SAMER EL DEBEK, a/k/a "Samer Eldebek," the defendant, established contact with several women in Thailand in April 2008, prior to his operational travel in 2009 and consistent with the instructions he says he received from his handler. In one such conversation, EL DEBEK asked a woman where she lived and if she was willing to be a guide. In other instances, EL DEBEK contacted women in Thailand to express an interest in getting to know them better.

24. Based on my review of emails received pursuant to a lawfully-obtained warrant, I have learned the following, in substance and in part:

a. Approximately two days before he returned to Lebanon from his mission to Thailand, SAMER EL DEBEK, a/k/a "Samer Eldebek," the defendant, contacted two of his brothers by email on or about May 15 and May 16, 2009, and told them he was on his way back to Lebanon. Among other things, he wrote "i m ok..i finish the deal here..suppose to arrive sunday..don't u guys worry." The IP address information associated with the emails indicates that EL DEBEK sent them from Bangkok, Thailand, and Kuala Lumpur, Malaysia.

25. Based on my review of reports of the interviews with SAMER EL DEBEK, a/k/a "Samer Eldebek," the defendant, I have learned the following, in substance and in part:

a. EL DEBEK said his next mission for Hizballah was to Panama, to where he traveled on two separate occasions. EL DEBEK said his first trip to Panama for Hizballah was in 2011 and lasted for approximately one month. EL DEBEK stated that he traveled there via Colombia.

b. EL DEBEK said he went to a language school in Lebanon in an effort to learn Spanish in late 2010, before traveling to Panama.

c. EL DEBEK said his operational taskings included learning to drive in Panama, determining the cost of opening a business, locating the U.S. and Israeli Embassies, and determining how to get to the Panama Canal. EL DEBEK said he was instructed to case and identify security procedures at the Canal and the Israeli Embassy and claimed that his purpose for locating the U.S. Embassy was simply to know its location. EL DEBEK said he took Spanish lessons while in Panama, and his cover story was that he was there to identify business opportunities.

14

    d. EL DEBEK said that while in Panama, he located hardware stores, in order to locate places where items such as acetone and battery acid, which are explosive precursors, could be purchased.

 26. Based on my review of copies of the United States and Lebanese passports of SAMER EL DEBEK, a/k/a "Samer Eldebek," the defendant, made as he left the United States on or about September 20, 2014, I have learned the following, in substance and in part:

    a. The copies of EL DEBEK's passports show that he left Lebanon, using his Lebanese passport, on February 15, 2011, and entered Colombia the same day, using his U.S. passport. On February 15, 2011, he used his U.S. passport again to enter Panama.

    b. On March 16, 2011, using his U.S. passport, EL DEBEK left Panama and entered Colombia. Four days later, on March 20, 2011, again using his U.S. passport, EL DEBEK left Colombia. The following day, using his Lebanese passport, he entered Lebanon.

 27. Based on my review of emails received pursuant to a lawfully-obtained warrant, I have learned the following, in substance and in part:

    a. Prior to SAMER EL DEBEK's, a/k/a "Samer Eldebek," the defendant, first operational mission in Panama, emails indicate that he solicited Spanish-language training as early as January 2010.

 28. Based on my review of records received from Facebook pursuant to a lawfully-obtained warrant, I have learned the following, in substance and in part:

    a. On or about February 2, 2011 -- less than two weeks before he traveled operationally for the first time to Panama -- SAMER EL DEBEK, a/k/a "Samer Eldebek," the defendant, updated his Facebook status with a post in Arabic, which translated reads: "Do not make peace or share food with those who killed your people. Irrigate the land with blood and quench the thirst of your forefathers until their bones [their remains] talk with you."[5]  Shortly thereafter, EL DEBEK shared a link in

---

[5] The translations cited herein are drafts and are subject to change.

15

Arabic, which translated reads: "Do not reconcile blood for blood or head for head!" An FBI linguist advised that this statement figuratively means "Never make peace."

29. Based on my review of reports of the interviews with SAMER EL DEBEK, a/k/a "Samer Eldebek," the defendant, I have learned the following, in substance and in part:

    a. EL DEBEK reported that his second mission to Panama, in 2012, was more focused on the Panama Canal. EL DEBEK said Hizballah asked him to identify areas of weakness and construction at the Canal, and provide information about Canal security and how close someone could get to a ship. In doing so, he stated, he took a lot of photographs of the Canal, which he later provided to the IJO.

    b. EL DEBEK said he was told to take pictures of the Israeli Embassy, but did not do so because it was not his primary mission and he did not want to put himself at risk.

    c. EL DEBEK said that while he was in Panama he passed by the U.S. Embassy and knew where it was located, and that, upon his return, his IJO handlers asked for photographs of the U.S. Embassy and details about its security procedures. His handlers were interested, he said, in periods of heavy traffic into and out of the U.S. Embassy, vehicular traffic patterns in front of the Embassy, and the locations of houses and apartments in close vicinity to the Embassy. EL DEBEK claimed that he did not take photographs of the U.S. Embassy and did not go inside of the Embassy during his mission to Panama, and therefore did not have a significant understanding of the Embassy's security procedures, but he also said that he informed his IJO handlers that he believed people waiting for a visa appointment entered the Embassy and then waited for their appointment inside.

    d. He said that this mission, like his first mission to Panama, lasted roughly a month. EL DEBEK said that when he returned to Lebanon from Panama, he met with his IJO handler and the handler's superior, and provided them with maps, notes, pictures, and the camera he used in Panama.

30. Based on my review of copies of the United States and Lebanese passports of SAMER EL DEBEK, a/k/a "Samer Eldebek," the defendant, made as he left the United States on or about September 20, 2014, as well as reports of communications with an agent with the U.S. Customs and Border Protection ("CBP"), I have learned the following, in substance and in part:

16

    a. On January 7, 2012, using his Lebanese passport, EL DEBEK left Lebanon and entered the United States at the John F. Kennedy ("JFK") Airport in Queens, New York.

    b. On January 19, 2012, EL DEBEK booked a flight from Newark, New Jersey, to Panama, which departed Newark the following day, January 20, 2012. On January 20, 2012, using his U.S. passport, EL DEBEK entered Panama.

    c. CBP records also show that EL DEBEK booked a flight from Panama to JFK Airport on February 19, 2012, which flight left Panama for JFK Airport on February 22, 2012.

    d. On March 11, 2012, using his Lebanese passport, EL DEBEK entered Lebanon.

  31. Based on my review of records received from Facebook pursuant to a subpoena and to a lawfully-obtained warrant, I have learned the following, in substance and in part:

    a. An analysis of IP addresses for the Facebook account of SAMER EL DEBEK, a/k/a "Samer Eldebek," the defendant, shows that the Facebook account was used, as of January 4, 2012, in Lebanon. That analysis also showed that the person using the account was in Panama from January 22, 2012, until February 21, 2012, in New York City on March 7, 2012, and in Lebanon on March 12, 2012.

  32. Based on my review of emails received pursuant to a lawfully-obtained warrant, I have learned the following, in substance and in part:

    a. Other email exchanges in late January 2012 also corroborate the instructions SAMER EL DEBEK, a/k/a "Samer Eldebek," the defendant, says he received from Hizballah to focus on the Panama Canal. In one such exchange, EL DEBEK informed a tour company he would be in Panama for only a few days and wanted to go on the "Pirate Trail and Panama Canal tour." In another communication, EL DEBEK advised a bird watching tour company he was interested in a tour in Soberania Park, a large park that is adjacent to the Panama Canal.

  33. Based on my review of reports of the interviews with SAMER EL DEBEK, a/k/a "Samer Eldebek," the defendant, I have learned the following, in substance and in part:

    a. EL DEBEK said he communicated with Hizballah members from overseas using email. He said Hizballah gave him

an email account to contact when he was away, and coded language to use in his emails to Hizballah. He also said he was permitted to use any email account he wished to use to communicate with Hizballah by email.

        b. EL DEBEK specifically remembered doing so during 2012 from Chinatown in New York City, and perhaps from Panama.

        c. EL DEBEK said he also used email for other purposes in connection with his missions, including to arrange for housing and to set up his cover story by sending emails to different companies indicating that he was looking for electronics, phones, and cameras for import and export.

    34. Based on my review of reports of the interviews with SAMER EL DEBEK, a/k/a "Samer Eldebek," the defendant, I have learned the following, in substance and in part:

        a. In or about 2014, EL DEBEK did not have any employer other than Hizballah and was not affiliated with another organization.

        b. From approximately 2007 to approximately 2015, EL DEBEK continued to be employed by and affiliated with Hizballah, and was eventually being paid over $1,000 per month by Hizballah, as well as medical expenses.

        c. EL DEBEK claimed that he was detained by Hizballah from approximately December 2015 to approximately April 2016, and accused of spying for the United States. According to EL DEBEK, his Hizballah captors claimed that they knew of his spying before he traveled on his missions, which they claimed were actually ruses to draw attention away from the real operations. EL DEBEK said he told Hizballah, as part of a false confession after repeated interrogations, that he worked for the FBI, CIA, and police; was paid $500,000 for his service to the United States Government; and worked for handlers named Jeff and Michael, names he made up.

    35. Based on my review of records received from Facebook pursuant to a lawfully-obtained warrant, I have learned the following, in substance and in part:

        a. Between November 6, 2014, and at least February 28, 2017, SAMER EL DEBEK, a/k/a "Samer Eldebek," has conducted approximately 258 Facebook searches using search terms such as "martyrs of the holy defense"; "martyrs of Islamic resistance";

"Hizballah martyrs"; and "martyrs of the Islamic resistance in Lebanon."

    b. EL DEBEK has also regularly conducted searches for the Facebook page of "Hamza Fadlalah," whose publicly-accessible Facebook page depicts photographs of and tributes to "martyrs," as well as photographs of Nasrallah, the leader of Hizballah.

WHEREFORE, deponent prays that a warrant be issued and that SAMER EL DEBEK, a/k/a "Samer Eldebek," the defendant, be arrested and imprisoned or bailed, as the case may be.

_____
DANIEL M. GANCI, SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

Sworn to before me this
31 day of May, 2017

_____
THE HONORABLE KATHARINE H. PARKER
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

19